In the Matter of the Judicial Settlement of the Accounts of CHRISTOPHER R. ROBERT, as Executor, etc.

The will of R. gave his residuary estate to five beneficiaries, his four children and a college, in unequal proportions, two children to whom advances had been made prior to the making of any will by the testator receiving less than the others. The will provided that "any moneys or indebtedness" that should appear upon the testator's inventories or books of account charged as "due him from any of said beneficiaries during his lifetime as an outstanding or unsettled account" at the time of his decease should be considered as forming part of his estate, and a discharge thereof by his executors, should be considered as so much payment and should be deducted from the share of such beneficiary, but without interest, unless some obligation "securing such indebtedness" should be found among the testator's assets upon which interest had been paid or charged, in which case it was declared "the said indebtedness shall continue to be charged." It was also declared that any moneys which should appear in his books charged to either of said beneficiaries "to a furniture or allowance account" should not be debited to

such beneficiary on settlement of the testator's estate, but should be "considered as a gift." *Held*, that the provision directing a deduction for indebtedness contemplated an actual indebtedness which might have been enforced by the testator in his lifetime, and so did not include the advances above mentioned, which were entered in his books and charged to said children as advances, and in his inventories up to the time of the execution of a will as "unavailable assets," although included as part of the estate "for distribution;" it appearing that in subsequent inventories they were not so included.

(Argued October 17, 1888; decided November 27, 1888.)

APPEAL from judgment of the General Term of the Supreme Court, in the first judicial department, entered upon an order made October 21, 1886, which affirmed a decree of the surrogate of the county of New York on final settlement of the accounts of Christopher R. Robert, as executor of the will of Christopher R. Robert, deceased.

The surrogate charged to and deducted from the share of the testator's son, Frederick Robert, under the residuary clause of the will, $20,000, and of his daughter Jane R. Corning $50,000. The said legatees excepted to these charges, and the question on appeal was simply as to the legality of these deductions.

The provisions of the will in question are as follows:

"*Fourthly*. All the rest, residue and remainder of my estate, real and personal, whatsoever or wheresoever, as well that I now have as that which I may hereafter acquire and die possessed of or entitled to (except such as is herein otherwise disposed of) I order and direct my executors hereinafter named, or such of them as shall qualify and act, the survivors and survivor of them, to sell and dispose of,   *   *   *   and after disposing of my said real and personal property, and, deducting from the proceeds thereof all necessary expenses and charges, also the thirty thousand dollars bequeathed my wife as before mentioned, to divide the remainder into fifty equal parts; and if my son Christopher R. Robert, Jr., be then living, to pay over to him twelve equal parts thereof, but, in case of his death prior to such distribution, upon such

distribution to pay over the said twelve parts to his lawful issue in equal portions, share and share alike.

"And if my son Frederick Robert be living at the time of such distribution, to pay over to him eleven of the said equal parts, but, in case of his death prior to such distribution, upon such distribution to pay over the said eleven parts to his lawful issue in equal portions, share and share alike.

"And if my son Howell W. Robert be living at the time of such distribution, to pay over to him twelve of the said equal parts, but, in case of his death prior to such distribution, upon such distribution to pay over the said twelve parts to his lawful issue in equal portions, share and share alike.

"And if my daughter Jane R. Corning be living at the time of such distribution, to pay over to her five of the said equal parts, but, in case of her death prior to such distribution, upon such distribution to pay over the said five parts to her lawful issue in equal portions, share and share alike.

"And upon such division to pay over to 'the trustees of Robert College of Constantinople' ten of such equal shares, which with the other bequests herein made to the said trustees of said college are for the endowment fund of the said college, and the money derived from the said bequests is to be invested in bond and mortgage on improved productive real property in fee simple, in the city of New York or Brooklyn, worth double the amount loaned at a low valuation — the income only to be used for the general uses and purposes of the said college.

"In case the said college shall be discontinued, then I will that the said bequest, as well as any other bequests herein made to the said college shall be applied by the said trustees of said college, in such manner as they may deem best for the general purposes of evangelical and Protestant education among any of the nationalities of the Turkish Empire.

"*Sixthly.* All moneys or indebtedness, which shall appear upon any inventory or ledger or books of account, kept by me, or under my direction, charged as due to me from him, or either of my said children, or Robert College of Constanti-

nople, during my lifetime, and as an outstanding or unsettled account at the time of my decease, whether with or without security, shall be considered as forming part of my estate mentioned or referred to in the fourth article of this my will, and a discharge from such indebtedness by my executors shall be deemed and taken as an equivalent to an equal amount paid such college, child or children, on account of its, his, her or their share and portion under this my will.

"And my executors are hereby directed to deduct the amount of such indebtedness from such respective share or portion, but no interest is to be charged upon or added to any such indebtedness, except in case a bond, note or other obligation, securing such indebtedness, be found among my assets, upon which said bond, note or obligation interest has been paid or charged, in which case the said indebtedness shall continue to be charged with interest.

"Any items or charges which may appear in any account of my private, personal or family expenses shall not be included or charged as such indebtedness. Nor shall any moneys which shall appear on my books charged to either of my said children to a furniture or allowance account be debited to such child on the settlement of my estate, but the same is considered as a gift made by me to such child during my lifetime."

The ledger account of Frederick Robert shows a debit January 1, 1876, when the account was closed, of $20,000. The account commences with an item under date of February 22, 1864, "To cash, $20,000;" and the entry in the day-book is in the following language:

"Advanced to Frederick Robert, on account of his portion of my estate, in order to enable him to go into business, which is to be charged him on settlement of my estate, but no interest, $20,000."

The ledger account of Mrs. Jane R. Corning closes with a balance under date of January 1, 1874, on the debit side, of $50,000. This account commences with an item, under date of May 6, 1864, "To cash, $50,000." The entry on the day book is as follows:

"Paid John H. Sherwood, for the house and lot No. 8 East Fortieth street, which I have given to my daughter, Mrs. Jane R. Corning, by deed from the said Sherwood, as her separate property, and as a part of her share in my estate. I charge the amount to her, but, though counted as part of my assets, no interest is to be charged thereon."

The claim of the executor was, that a discharge of these items was to be deemed, under the sixth clause of the will, as the payment to Frederick Robert and Jane R. Corning, of so much of their shares in the residuary estate.

Further material facts are stated in the opinion.

*Edward C. Perkins* for Frederick Robert, appellant. The advance made to this appellant does not come within the plain definition, contained in the sixth clause, of the sums which the testator intended to be deducted by the executors from the residuary bequests. (*Chase* v. *Ewing*, 51 Barb. 613.) The sixth clause has already been judicially construed by this court in accordance with our contention. (*Robert* v. *Corning*, 88 N. Y. 225, 241.)

*Esek Cowen* and *Charles F. Stone* for appellants. An "advancement" in law is an irrevocable gift by a parent who afterwards dies intestate of the whole, or a part of what it is supposed the child will be entitled to, on the death of the party making the advancement. (1 Grant's Cases, part 370.) The amount of $50,000, being an absolute gift or advancement to Mrs. Corning, as a part of her prospective share of her father's estate, was not a "part" of his estate, to be deducted from her share of the residuum, under the sixth clause of the will. (*Rogers* v. *Daniels*, 8 Allen, 343.) The language of this testator being, at the least, reasonably capable of a construction, which will not operate to disinherit his only daughter, it follows that her construction is the true one. (*Low* v. *Harmony*, 72 N. Y. 414; *In re Brown*, 93 id. 300; *Hoyt* v *Hoyt*, 85 id. 142, 149.) In the construction of wills, a construction which makes a provision of the will nugatory and ineffectual,

will not be adopted if it is possible to avoid it. (*McCorn* v. *McCorn,* 100 N. Y. 513.)

*Thomas G. Shearman* for Robert College, respondent. The effect of the will is open to modification by entries, in the testator's books, made previously to the date of his will, even though unattested, so long as they are referred to in the will. (*Brown* v. *Clark,* 77 N. Y. 309; *Habergham* v. *Vincent,* 2 Ves. 204, 228; *Smart* v. *Prujean,* 6 id. 564, 565; *Burton* v. *Newberry,* L. R., 1 Ch. Div. 234; *Allen* v. *Maddock,* 11 Moore P. C. 427; *Williams* v. *Evans,* 1 Cromp. & M. 42; *Tonnelle* v. *Hall,* 4 N. Y. 145; *Pigot* v. *Wilder,* 26 Beav. 90; *Aaron* v. *Aaron,* 3 D&G. & S. 475; *Chambers* v. *McDaniel,* 6 Ired. Law, 226; *Johnson* v. *Clarkson,* 3 Rich. Eq. 305; *Hitchcock* v. *Wood,* 2 Moore P. C. 355; *Harvey* v. *Chouteau,* 14 Mo. 587; *Bizzey* v. *Flight,* L. R., 3 Ch. Div. 269; *In re Mercer,* L. R., 2 P. & M. 91; *Anderson* v. *Anderson,* L. R., 13 Eq. 381; *Quihampton* v. *Going,* 24 Week. Rep. 917.) The meaning and intent of the sixth clause in the will was to charge against the shares of the children the precise sums which are now charged by the decree against them. The meaning of the word "indebtedness," as used in the will, is any sum which the testator has chosen to enter upon his books or inventories as in form an indebtedness. (*Chase* v. *Ewing,* 51 Barb. 613.) The language of a testator is not to be construed with the legal nicety of a statute, or even of a contract between living parties. (*Phillips* v. *Davies,* 92 N. Y. 199; *Hoppock* v. *Tucker,* 55 id. 207; *Lytle* v. *Beveridge,* 58 id. 598.) Where words are unambiguous, they cannot be departed from, merely because they lead to consequences which may be considered capricious or even harsh and unreasonable. (*Abbott* v. *Middleton,* 7 H. L. C. 89; *Gordan* v. *Gordan,* L. R., 5 H. L. 254, 284.)

*John M. Bowers* for C. R. Robert, executor, etc., respondent. If a will incorporates in itself, by reference, a paper in existence at the date of the will, and clearly identified as the

paper referred to, it is to be read as a part of the will. (*Qui-hampton* v. *Going*, Week. Notes for 1876, 209 ; 29 Week. Rep. 917 ; *Tonnelle* v. *Hall*, 4 N. Y. 140 ; *Lawrence* v. *Lindsay*, 68 id. 108 ; *Newton* v. *Seaman's Friend Society*, 130 Mass. 91 ; 1 Dem. 306 ; *Hitchcock* v. *Wood*, 2 Moore P. C. 355 ; *Bizzey* v. *Flight*, L. R., 3 Ch. Div. 269, 273.) The power of the court may be exercised to construe a will ; it cannot be exercised to make it anew. (*Wood* v. *Bishop*, 1 Dem. 518 ; *Phillips* v. *Chater*, Id. 535 ; *Seguine* v. *Seguine*, 4 Abb. Ct. App. Dec. 191, 194 ; *Clapp* v. *Fullerton*, 34 N. Y. 192, 196 ; *Phillips* v. *Davies*, 92 id. 199, 204 ; *Lytle* v. *Beveridge*, 58 id. 598, 602, 604.) The word indebtedness, so far as the terms of this particular will were concerned, must be construed as synonymous with the word moneys. (*Oudoyan* v. *Palazi*, 49 Law T. [N. S.] 666 ; *Tulhum* v. *Chitty*, 4 Jones' Eq. [N. C.] 244; *Smith* v. *Davis*, 1 Grant [Penn.] 158; *Paul* v. *Ball*, 31 Tex. 10 ; *Poole* v. *Poole*, 7 L. R., Ch. App. 17 ; *Colton* v. *Colton*, 127 U. S. 300.) The questions in issue here were not determined in the litigation over the construction of the will. (89 N. Y. 241 ; *Langdon* v. *Astor*, 16 id. 26 ; 23 Hun, 299, 305.) The advancements were indebtednesses which necessarily form part of the personal estate, and would be collected by the executor on the settlement of the estate. (3 R. S. [7th ed.] 2213, 2305 ; *McRae* v. *McRae*, 3 Brad. 199, 206.) A conveyance to a child, either directly or by a payment of the purchase-money, and having the deed made to the child, is *prima facie* an advancement. (*Weavers' Appeal*, 63 Penn. St. 309.)

Finch, J. The problem to be solved on this appeal is the meaning and intent of a single provision in the will of the testator. By itself it presents no difficulty and is not at all ambiguous, but read, as it must be, in connection with the entries standing upon the books of the testator at the date of his death, it invites a scrutiny which has led to different and contradictory constructions. The provision reads thus : "All moneys or indebtedness which shall appear upon any inven-

tory or ledger or books of account kept by me or under my
direction, charged as due to me from any or either of my said
children or Robert College of Constantinople during my life-
time and as an outstanding or unsettled account at the time of
my decease, whether with or without security, shall be con-
sidered as forming part of my estate mentioned or referred to ·
in the fourth article of this my will, and a discharge from
such indebtedness by my executors shall be deemed and taken
as an equivalent of an equal amount paid such college, child
or children on account of its, his, her or their share or portion
under this my will."

If we pause for a moment to scan this language and gather
the testator's meaning from his words alone, it is impossible
not to see that he refers to existing debts due and payable to
him, some of which are secured by collateral liabilities and
some of which may not be, but all of which stand charged   ·
against the debtors as outstanding and unsettled accounts and
are capable of being released and discharged by his executors.
The description plainly contemplates cases of actual indebted-
ness which might have been enforced by the testator in his
lifetime, and which his books show were not so enforced, but
remain unsettled and outstanding at his death.   The use of
the word "moneys" preceding the words "or indebtedness"
does not throw a doubt upon this interpretation, for they are
included in the phrase "such indebtedness" when the dis-
charge is referred to, and must be charged as due to the
testator, and as an outstanding and unsettled account, and
constituting a liability which admitted of a release.

That this interpretation is, upon the face of the provision, the
natural and obvious meaning of the testator is quite evident
from the impression which it left upon our minds when other
questions arising out of this will were before us for determina-
tion. (*Robert* v. *Corning*, 89 N. Y. 241.)   I do not think we
then settled the question now raised, for the testator's words
were not at that time confronted with his books of account or
the entries upon them, nor was accurate attention challenged or
analysis demanded in view of those entries; but the case in

all the courts drew out an expression of what seemed the natural and obvious interpretation of the provision. The Special Term said "the whole phraseology shows that it was only existing indebtedness which was to be deducted if found charged on testator's books, and that the charges on the books were not to be arbitrarily deducted, but must have their foundation in an indebtedness." The General Term added, "the indebtedness must be actual and such as would form, by reason of its character, a portion of the personal estate which could be collected by the executors." And we said of it that it was "intended to provide simply that any actual indebtedness found charged concurrently therewith on the testator's books of account should go in diminution of the payments to the several legatees as a part of their shares, respectively." These expressions show one thing at least; that the words of the testator, taken by themselves, conveyed a precise and definite idea, about which there was no room for doubt or hesitation; and that, if ambiguous at all, they have become so by the light thrown upon them from the facts to which they have been applied.

But the provision in the will continued thus: "And my executors are hereby directed to deduct the amount of such indebtedness from such respective share or portion, but no interest is to be charged upon or added to any such indebtedness, except in case a bond, note or other obligation, securing such indebtedness, be found among my assets, upon which said bond, note or obligation interest has been paid or charged, in which case the said indebtedness shall continue to be charged with interest." In this clause we find an added incident of the indebtedness before referred to. It is such as is interest bearing, either by its own terms or by operation of law consequent upon its being due and payable, and the object of the provision is to interfere with and modify the legal rules which would attach interest to the debt due or to become due. It means that interest is not to attach to the debt, except where a note or obligation exists, upon which interest has been paid or charged. Here again the character of the indebtedness

referred to by the testator is stamped upon it by an indelible mark. It is an indebtedness which, by its terms, or because it is "charged as due," is interest bearing, and, therefore, can only mean an actual debt which the child, as debtor, owes to the father as creditor, and which the entry upon the books, as an outstanding account, shows that the father has not forgiven or discharged.

The will then adds a further provision to avoid a possible mistake or misapprehension, and one upon which the respondents very much rely. That clause reads: "Any items or charges which may appear in any account of my private, personal or family expenses, shall not be included or charged as such indebtedness. Nor shall any moneys which shall appear in my books charged to either of my said children to a furniture or allowance account be debited to such child on the settlement of my estate, but the same is considered as a gift made by me to such child in my lifetime." The distinction here made impresses my mind as one of the most decisive character. It is between a debt and a gift; a debt due and payable, and a gift not payable at all; a claim capable of collection and enforcement, and a donation executed and ended; a debt to be deducted, and a gift not to be deducted. The clause indicates a recollection in the mind of the testator that there stood upon his books charges in his private account or against his children, which, on their face, would appear to be debts, and the true character of which, as gifts, the books would not disclose; and so, under his will, his intention would be thwarted, and, what was really a gift and not a debt, would stand as a debt for want of an explanation in or a disclosure of the truth by the books themselves. To guard against that error he puts the explanation, which the books do not contain, in the will itself, and so substantially declares that entries are upon his books which import a debt from the form in which they are made, but which, in truth, are not a debt but a gift, and were so intended, and which, therefore, should not be included in the deductions from shares or portions. So that in every possible way, by direct expression and indirect description, by

definite incidents and characteristics, and by a special exclusion
of gifts made and executed, although entered in form as debts,
this testator, a man unusually careful and methodical, thought-
ful in his purposes and accurate in their execution, impresses
upon us by his will that what' he directs should be deducted
from each child's share or portion is that child's debt due and
payable to the testator and not forgiven, but not any gift or
donation made and executed as such and with that purpose·
and intent.   I reach this construction from the language of
the will alone, without drawing upon the surrounding circum-
stances as an aid to the interpretation, or fortifying the con-
struction by an appeal to consequences.   Whether this inter-
pretation is made doubtful, or the language should apply to,
something which, though not a debt, was regarded by the
testator as a debt, remains the final question to be considered.

The testator executed the will in January, 1878, and died
in the succeeding October.   He left four children, Christo-
pher, whose account as executor is here involved, Frederick,
Howell, and Jane, his only daughter, and married to Ephraim
L. Corning.   The evidence indicates that a prior will was
made, about a year and a half before the one probated, the
contents of which we do not accurately know, except that the
sixth clause, now under consideration, seems to have been
identical in both instruments.   The witness also thought that
in the earlier will the estate was divided into fiftieths, and he
had an impression that their distribution was the same as in
the final will, although he felt obliged to say, "I do not
know."   So that it may be possible to assume that in the early
part of 1876, a will of the testator was in existence substan-
tially like the one probated in the material respects with
which we are concerned; but the ledger account with
Mrs. Corning ends January 1, 1874, and that of Frederick, Janu-
ary 1, 1876, and those accounts began and ended when no
will was in existence at all, or if by possibility there was one,
we know nothing of its contents, and have no proof of its
execution, and the accounts were begun and continued in
contemplation of a possible death intestate.

On the 13th of February, 1864, the testator advanced to his son Frederick $20,000, and made the following entry in his journal: "*Advanced* to Frederick Robert, on account of his portion of my estate, in order to enable him to go into business, which is to be charged to him on settlement of my estate, with no interest, $20,000." On the 6th day of May, in the same year, he made this entry: "Paid John H. Sherwood, for house and lot No. 8 East Fortieth street, which I have *given* my daughter, Mrs. Jane R. Corning, by deed from the said Sherwood, as her separate property, as a part of her share in my estate, $50,000. I charge the amount to her, but though counted as part of my assets, no interest is to be charged thereon."

It is not easy to mistake the meaning of these entries. They import, in each case, an advancement, to be charged and counted in case of intestacy, in order to produce equality of distribution. They import gifts executed, and intended as such, and not at all debts or liabilities in any manner due or payable to the testator or his estate. The money of Frederick is specifically described as an advancement; the house and lot to Mrs. Corning, as given to her for her separate property. Neither was to be paid back or restored; both were to be kept and retained. No element of debt or liability attached to either, and each was to be charged only as an advancement, and in accordance with the truth, and for the purpose of distribution in the possible emergency of an intestacy. For, while Mr. Robert may, even at that early date, have contemplated the making of a will at some time in the future, yet that is not certain, and at all events he knew that he had made none; he knew that death might come at any moment and produce intestacy, and he, who soberly declared that he never postponed a duty which should be done at once, guarded against the injustice and inequality which might follow intestacy, by recording his gifts as advancements, charging them to the son and daughter as such, and taking them out of the category of debts by stamping them as gifts, and declaring that they should be counted only for

the purposes of distribution, and that in view of the then existing state of affairs, which was a death intestate if he should die suddenly, or soon, or before he had found time or disposition to make or execute a will.

These advancements he charged, as he said he should, in his books and upon his accounts to Frederick and Jane, respectively. Those charges in no manner altered the inherent character of the gifts or changed them into a debt. Down to the close of the accounts, and in every repetition of the items, they were the original gifts, charged as such, and recording the true transaction and not a false one of a debt. The process of bookkeeping should not mislead us. The ledger entries and form of the inventories might import, if standing alone, an indebtedness of Mrs. Corning and Frederick, or something which the testator regarded as such, but the proof dissipates any such danger of mistake. One of the bookkeepers carefully explains that the character and meaning of the charge must all the time be referred back to the original journal entry from which it passed into the accounts, and once drawn into the system must continually reappear, but will never acquire any new meaning or have any changed effect. Gifts they were as entered upon the journal; gifts they remained when transferred to the ledger; and gifts still they were considered and regarded when they took their place upon the inventories, for there they were classified as "unavailable" assets. If ever they were debts due from the children, or would be so due after his decease, they were perfectly good and as available as any actual assets upon his list. The debts which some of his children did, in fact, owe him he did not hesitate to class among his available assets, but the items of advancement were classed as unavailable because they were merely constructive assets to be counted as such solely for purposes of distribution in the emergency of his dying intestate. In effect he so declares. In the inventory of December, 1874, after ascertaining the market-value of his available assets, he adds the three advancements to Frederick, Howell and Mrs. Corning under the phrase "amount due from," and says

at the end, " amount for distribution as near as I can tell." At that date he had made no will ; at that date if he had died the law would have disposed of his property on that basis of equality which it deems the nearest approach to justice ; and it was that distribution to which the father referred ; in view of that distribution that the entries were made ; and for the purposes of that distribution that the advances were charged as " amounts due me."

But after all these entries were made, and while they stood upon his books he made and executed his will. At that moment all questions of advancement disappeared, and the entries framed for the emergency of intestacy ceased to be material, since not the law but the testator himself was about to dictate the ultimate division of his estate, and do for himself that which seemed to him just. Treating Robert College as one of his children, he divided his estate into fiftieths. He gave to his son Christopher twelve parts, to Frederick eleven, to Howell twelve, to Mrs. Corning five and to Robert College ten. Here, on the face of it, is a singular inequality, which must have had some cause and some explanation. For sixteen years the testator had contemplated an equality of division among his children, and carefully kept his books and accounts so as to effect that equality in spite of his varying gifts to three out of the four. If he took those gifts into account, as we are bound to suppose that he did, substantial equality was preserved ; for then it will appear that he took five parts from Mrs. Corning, whose advance of $50,000 had been swollen by the sale of her house to $70,000, because of that advance, and gave one part to Frederick, whose advance was less, and the remaining four to Christopher and Howell. If that was not the explanation, what was it ? Mrs. Corning was his only daughter. He bought the house which he gave to her, and which adjoined his own, to keep her near to him. When she went abroad he expressed his disappointment, but soon followed her across the ocean, and traveled with her on the continent, and later, repeating his voyage, joined her in Paris,

where, in the atmosphere of her care, his last days were passed, and in the shadow of her sorrow he died. We are told that he could do as he pleased. Undoubtedly. But what it *was* that he pleased becomes the question, if we once reject the natural and reasonable explanation of his action.

. Let us recur again to the language of the testator's will. When it was drawn there were three classes of charges against his children standing upon his books, of the form and foundation of which he had a perfect knowledge. First. There were debts due and payable to him as creditor from children who were his debtors. Frederick owed him for a loan of $30,000, which, with interest and further sums lent, amounted in December of 1874 to a little over $38,000; an indebtedness which the son does not at all dispute, or display any reluctance to pay. Christopher stands charged with more than $40,000; Mrs. Corning with a varying balance on her special account, and Robert College with a small amount. Second. There were the gifts to three of the children, described in the accounts as gifts and in the inventories as unavailable assets entered as part of the estate for purposes of distribution before any will was made. And, third, there were moneys and property with which the children stood charged in form as debtors, but which, in reality, were gifts, though without adequate explanation in the books showing them to be such. To the first class the language of the sixth clause concededly applies and is satisfied by that application. To the second class it does not apply at all, and was not intended to apply. To the third class the explanation withheld in the books was given in the will, and that fact answers the inquiry of the respondent why the testator in the preparation of his will should have been careful to describe as gifts sums charged for furniture and for allowances but should omit such explanation as to the larger advances. The latter needed no explanation in the will, since they were fully explained in the books. The former were not explained in the books, and so required explanation in the will.

The executor deemed it his duty to deduct from Frederick's

share the gift of $20,000, and from Mrs. Corning's the gift of $50,000, the result being, in her case, that she was practically disinherited. The testator, in view of his precedent gifts to her, took away five-fiftieths from her share or portion, and then the executor charged them over again as debts, and canceled, substantially, the whole legacy bequeathed. The surrogate and the General Term sustained him in his action. The opinions rendered concede that the advancements were not an indebtedness in the ordinary sense of the expression, but insist that they were regarded as such by the testator when the charges were made, and must continue to be so regarded when the language of the will is to be construed. It seems to me quite certain that the testator never at any time regarded the advances as an indebtedness for any purpose whatever. He spread upon his books the exact truth, and made his entries to relate to that truth. He regarded the sums charged not as debts, but as gifts, and shows us not only that the distinction existed, but was in his mind, for, when he says of the furniture and allowance charges these may seem to be debts from the manner of their entry, but they are not debts, they are gifts, and, therefore, must not be deducted, he, in substance, says, I mean that debts shall be deducted and not gifts, even though the latter, for lack of explanation, appear to be debts. The advances were declared to be gifts on the face of the entries, were, in truth, gifts, and nothing else, and were regarded as such by the deceased, and it was as gifts and advances that they were charged, for the one purpose which dictated their entry, that of distribution in the emergency of intestacy.

Two things, however, are said in answer to this view of the case, which seem to require more deliberate consideration. While the accounts, as such, ended before the present will, or the one which preceded it, were made, and so were all made in contemplation of a possible intestacy, the inventories continue down to a later period, and one of them was made in December, 1877, shortly before the last will was executed, and in that, under the head of "unavailable property," are

included the gifts to Frederick and Mrs. Corning ; and it is asked why the testator continued to inventory them, if by making a will the danger of intestacy was gone, and if by that will he had made the charges utterly immaterial. The question is a just one and demands an answer.

It would not have been strange if, by reason of the manner in which the inventories were made, and of the exigencies of an unyielding system of bookkeeping, it had happened that the later inventories followed the form of the earlier ones and repeated entries which had become needless ; for each new inventory was naturally modeled by the bookkeeper upon that which preceded it, and would be likely to sweep over all the entries in the books. But this testator was a very careful and prudent man, and while his bookkeeper, in framing the inventories of 1876 and 1877, followed the form of those previously made, they disclose a marked and significant variation from those of 1874 and 1875. In those the unavailable assets were first deducted and then to the balance was added the advancements to Mrs. Corning and Frederick, and the consequent total described as the sum for distribution. This process clearly indicated that the two gifts were to form part of the estate for purposes of distribution. But this was before either of the wills were made or contemplated; and in the following inventories of 1876 and 1877 the "unavailable" assets are again deducted but *left deducted*. The gifts are no longer added to the sum total of the estate, for the purpose of their addition had ended. They are taken out and left out, and not even added as constructive assets, or stated to have formed part of the estate as aggregated for distribution. On the contrary, they are dismissed from the assets as utterly as if they had been bad debts or worthless property ; and so dismissed for the first time at just about the date when, as nearly as we can judge, the earliest will was drawn. It was as if the testator had said in so many words — hitherto, while I had no will, I added the gifts made to Frederick and Jane to my assets for purposes of distribution and to preserve equality ; but now, having made a will and dictated the distribution, I deduct .

these from the inventory of my assets, and cease to include them in the total of my estate. Observe, too, that this marked and significant change must have been the product of a direct and intended interference of the testator himself. The book-keeper, left to himself, would have followed the long existing custom which added the gifts to the estate, and more especially would have followed the form of the preceding year, in which the gifts once deducted as unavailable assets, were again deliberately added to reach the total of the estate; and so the testator, in 1876, must himself, and purposely, have prevented their addition, in effect, declaring that they were not to be deemed for any purpose a part of the estate, the total of which was being ascertained. The consideration of this deliberate change impresses my mind as of very great weight.

But it is further asked why the sixth clause should have been inserted in the will at all if it related only to debts. The argument is that debts would have been assets and formed part of the estate for purposes of distribution without any provision to that effect in the will, and so the sixth clause must have had a different purpose. I think the answer is that it did have a further purpose, and that was to limit the right of the estate only to *such* debts of the children as the testator had not for-given, and to exclude such as he did not choose to regard as debts, although they might prove to be legally of that character. And so the provision is, not that *all* debts of the children should be deducted, but *such* debts as his books showed he recognized to be debts and which stood thereon as due to him in the form of an open and unsettled account. The sixth clause, therefore, was not unnecessary or superfluous upon the construction which I think is the correct one.

Much might be added as to the consequences of a contrary interpretation; and as to other provisions of the will indirectly sustaining the view now presented, but quite enough has been written to show the grounds upon which I dissent from the conclusion of the courts below.

The judgment of the surrogate and the General Term should be reversed, and the case remitted to the surrogate for dis-

tribution in accordance with the doctrine of this opinion ; the costs of all parties to be paid out of the estate.

All concur, except RUGER, Ch. J., and DANFORTH, J., dissenting, and GRAY, J., taking no part.

Judgment accordingly.